UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JEFFERY T. DAVIS,
    Plaintiff,

vs.                                                    05-1238

DAVID OWENS, et al.,
    Defendants.

**OPINION**

Before the court is the defendants, Richard Hirsch, Clayton Arnold and David Ziemer's unopposed summary judgment motion. The defendants move for summary judgment pursuant to pursuant to Fed. R. Civ. P. Rule 56 and Local Rule 7.1.

**Standard**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)*; Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). Further, this burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). Credibility questions "defeat summary judgment only '[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility.'" *Outlaw*, 259 F.3d at 838, *citing* Advisory Committee Notes, 1963 Amendment to Fed. R. Civ. P. 56(e)(other citations omitted).

Fed. Rule Civ. Pro. Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988). A "metaphysical

doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Disputed facts are material only if they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986).

## Background

The plaintiff claims that the defendants Hirsch, Arnold and Ziemer used excessive fordce in arresting Davis. The defendants arrested the plaintiff after he had a physical altercation with a female, Jodie Allen. The officers were told that Davis had a gun and would return to shoot Allen. The office conducted a felony traffic stop of the plaintiff's vehicle and took him into custody. Davis claims that he suffered a fractured jaw during his arrest. He claims the defendants were deliberately indifferent to his health and safety and failed to provide him with medical care for his serious medical needs.

The defendants did using excessive force in arresting Davis. They assert that they took him into custody without difficulty and that he suffered no apparent injury. The defendants assert that Davis did not have any apparent injuries at the time of or subsequent to his arrest. Defendants further assert that Davis did not have a "serious medical need" and the officers were not deliberately indifferent to any of his medical needs.

## Statement of Undisputed Material Facts

1. Davis has had a number of felony convictions in McLean County for aggravated battery and a number of retail theft cases. He was also convicted of possession of a stolen vehicle in Cook County. He has been incarcerated with the Illinois Department of Corrections several times. First Davis dep. (Exhibit L) at 9-10.[1] Officer Ziemer had at least two prior encounters with Davis involving Davis being drunk in public. Exhibit O (Second Affidavit of Officer Arnold) at ¶2. Officer Hirsch had at least one prior encounter with Davis in which Davis resisted after being taken into custody on an outstanding warrant. Davis claimed that he had a broken back and leg, but no injuries were found when he was seen in the emergency room. Exhibit P (Second Affidavit of Officer Hirsch) at ¶2.
2. Prior to March 7, 2004, Davis lived with Debra Lindsey at 815 E. Jefferson in

---

[1] Exhibits A and C –K refer to the exhibits to Defendants' Response to Davis' Motion for Summary Judgment (#170) as follows:
   A. Affidavit of Hirsch      C. Affidavit of Ziemer      D. First Davis deposition
   E. Second Davis deposition    F. Copenhaver deposition   G. Photo of "fat lip"
   H. Booking photo - right    I. Booking photo - left  J. Dr. Escobar deposition
   K. Naour deposition
   Exh. B (Arnold Affidavit) and exhibit following K are attached to defts' motion [195].

        Bloomington. First Davis dep. at 5. Davis got into an argument with Lindsey around March 7, 2004 and was forced to move out of the apartment. First Davis dep. at 17.
3. On March 7, 2004, Davis went to Jodie Allen's apartment on East Market in Bloomington. First Davis dep. at 17-18, 20-21. They talked and decided that Davis would stay with her. He moved his stuff to her apartment. First Davis dep. at 18. They were former paramours. First Davis dep. at 18.
4. On March 8, they were at the apartment with Brandy Stein. First Davis dep. at 17-19. Stein was ill and Allen brought her to the apartment to look after her. Allen referred to Stein as her daughter, but Davis knew that this was not true. First Davis dep. at 19-20. Davis confronted Allen and asked what her deceased son would think of her "drinking... and letting her life just go down the drain..." First Davis dep. at 20. They got into an argument and she hit him in the bottom lip with her hand. First Davis dep. at 20.[2] It was a "hard hit" that caused his lip and tooth to swell up. First Davis dep. at 145. Davis pushed her back, causing her to fall backwards, knocking a lamp into the wall and off the table, breaking it. First Davis dep. at 22, 144-145. During the altercation, Allen bit Davis on the breast and arm. First Davis dep. at 144-145, 149-151. Davis cannot recall exactly how she managed to bite him on both his arm and chest during their allegedly brief altercation. First Davis dep. at 150-151.
5. Davis left, got into a car and drove away. First Davis dep. at 20-21.
6. At approximately 1:45 a.m. on March 9, 2004, MetCom received a report of an aggravated battery and dispatched Officers Arnold and Hirsch to Jodie Allen's apartment at 407 E. Market St. in Bloomington. Second Affidavit of Arnold at ¶ 4; Second Affidavit of Hirsch at ¶4. MetCom advised the officers that the victim reported that the suspect, Jeffery Davis, was carrying a gun. *Id.*
7. Davis drove to his old apartment on East Market, a couple of blocks away. When he turned onto Market, he extinguished the headlights on the car. First Davis dep. at 21. Officer Arnold witnessed this maneuver and notified Officer Hirsch by radio. Second Arnold Aff. at ¶5. Davis parked in front of the apartment building. First Davis dep. at 21.
8. Davis was arrested onMarch 9, 2004 at approximately 2:00 a.m. First Davis dep. at 17, 33, 35. Officers Hirsch and Arnold pulled up behind his parked car with their overhead emergency lights on. They instructed Davis to throw the car keys out the window, get out of the car, and put his hands up. He complied. First Davis dep. at 26-27. Officers told him to walk backward toward them and he complied. First Davis dep. at 28. Davis claims that he was then picked up and "slammed" on the ground and that his face hit the ground. First Davis dep. at 29. The officers yelled at him, "Where is the gun?" First Davis dep. at 30-31.
9. After the arrest, Davis' lip was still bleeding from Jodie Allen's punch. First Davis dep. at 32. Davis does not recall bleeding from any other injury after his arrest. First Davis

---

[2]The defendants note that the account of the incident given by Brandy Stein and Jodie Allen is markedly different, as reflected in the police reports attached to the officers' affidavits. For purposes of this motion, however, the court accepts Davis' version of the facts.

dep. at 32.
10. Davis asked the Officers why they used the force that they did. The officers explained that they were told that Davis had a gun. First Davis dep. at 34-35.
11. The officers involved in the arrest did not observe any injuries warranting medical attention. Affidavit of Arnold (Exhibit B) at ¶6; Affidavit of Hirsch (Exhibit A) at ¶6, Affidavit of Ziemer (Exhibit C) at ¶6.
12. Davis admits that he "was not in need of medical attention for the "black eye injury," the "fat lip injury" nor any "minor cuts on the left side of (his) face..." Plaintiff's Reply to Defendant Phares, Fellner, Kessinger, and Allens Responce (sic) to Plaintiffs Motion for Summary Judgment [175] at 7. Davis' only claim is for the alleged fractured jaw.
13. Davis was taken to the McLean County Jail and booked into the jail. He was booked in following normal procedures. First Davis dep. at 43-52; Defendants' Appendix of Exhibits in Support of its Response for Summary Judgment ("Phares Exhibits") [161], Exhibit No. 5 (Simpson affidavit) at ¶2-7.
14. If Davis was in obvious need of emergency medical care, the McLean County Jail would have refused to accept him. The jail would have instructed the arresting officer to take him to the hospital. Defendants' Appendix of Exhibits in Support of its Response for Summary Judgment ("Phares Exhibits") (#161), Exhibit No. 5 (Simpson affidavit) at ¶¶7; Naour dep. at 43-44, 45-46.
15. The correctional officers at the jail did not observe any significant injuries requiring medical attention. Defendants' Appendix of Exhibits in Support of its Response for Summary Judgment ("Phares Exhibits") (#161), Exhibit No. 5 (Simpson affidavit) at ¶4-5.
16. Photographs were taken of Davis' left and right sides of his face when he was booked and Davis agreed that the photographs accurately reflected his condition at the time. First Davis dep. at 51-52.
17. Davis was seen and evaluated by medical personnel at the jail as needed. Phares Exhibits, Exhibit No. 5 (Simpson affidavit ) at ¶4-10, Exhibit No. 6 (Naour affidavit) at 7-9, 12, 15-18. Davis was seen by Dr. Inoue and nurse Mary Copenhaver at the jail on March 17, 2004. Dr. Inoue told Davis that the jaw did not appear to be a serious issue and tried to convince Davis that there was nothing wrong. Second Davis dep. (Exhibit M) at 17-18. Dr. Inoue indicated that the jaw looked normal to him. First Davis dep. at 86. Davis insisted that his jaw be x-rayed for fractures. *Id.* Dr. Inoue ordered an x-ray, which was taken the same day. First Davis dep. at 84, 87; Copenhaver dep. at 13-17. The x-ray was negative for a fracture. Copenhaver dep. at 16; First Davis dep. at 84; Inoue aff. at ¶9-10.
18. When Davis was booked in at the jail, the McLean County Field Arrest Report indicated: "Medical Attention: Yes" and "Medical Comment: None stated. Minor cuts on left side of face." Plaintiff's Reply to Defendants Hirsch, Arnold and Ziemer's Response to Motion for Summary Judgment (#183) at Exhibit 10.
19. The photographs of Davis taken on the night he was arrested do not show any significant injuries which would require medical attention. Copies of the photographs were attached as Exhibits G (photo of "fat lip"), H (right side) and I (left side) to Defendants' Response to Davis' Motion for Summary Judgment (#170). Davis agreed that the photographs accurately reflect his condition. Second Davis dep. at 51-52.

20. Davis was transferred to the Illinois Department of Corrections on March 24, 2004. Second Davis dep. at 23. He was taken to Stateville Correctional Center for two weeks before being transferred to Danville Correctional Center. Second Davis dep. at 9-10. He was seen by the intake doctors at Stateville. Second Davis dep. at 25-26. During the two weeks he was at Stateville, the facility did not find it necessary to provide any medical care for his jaw other than providing aspirin or Tylenol. Second Davis dep. at 9-10.
21. Davis was seen by Dr. Escobar on April 2, 2004 and surgical repair of a fractured zygomatic arch in his jaw was performed on April 8, 2004. Escobar dep. (Exhibit N) at 4-5, 9.
22. Dr. Escobar opined that the injury he treated was at least six weeks old (Escobar dep. at 16-17), meaning that the injury was sustained on or before February 25, 2004 –at least six weeks prior to the date of surgery and at least two weeks prior to his arrest. Dr. Escobar testified:
    > Q. Okay. And in an adult how long would it take for the fracture to have reached a level that it had healed, and what are the parameters in terms of the number of weeks in order for healing to have taken place to a level which would cause you to rebreak it?
    > A. It's hard to tell, you know. That's difficult. It depends on the patient, but usually it's six weeks.
    > Q. Six weeks?
    > A. (nodding)
    > Q. So is it more likely than not that this fracture, at the time you saw it and operated on it, would be *about* six weeks old?
    > A. I don't know that.
    > Escobar dep. at 7-8 (emphasis added)
    > Q. And after observing the fracture during surgery, I understand it's still your position that you can't give us an opinion regarding the age of the original injury.
    > A. It was healed, according to the records.
    > Q. Does the fact that it was healed mean that it was at least six weeks old?
    > A. A fracture is considered healed after six weeks.
    > Q. Okay. So does that indicate to us then that the injury that you did surgery on was *at least* six weeks old?
    > A. Most likely.
    > Escobar dep. at 16-17 (emphasis added).
23. Dr. Escobar told Davis "he couldn't hardly fix it because it had healed..." First Davis dep. at 102. Dr. Escobar told him that "he couldn't actually fix it back the way it was to normal because it had healed. It had been too long." First Davis dep. at 103.

24. There is no medical evidence to support Davis' contention that his jaw was broken initially on March 9, 2004. No doctor or other healthcare provider has given testimony to support that proposition.

25. The zygomatic arch, where Davis' fracture was located, is between the eye and the ear. Escobar dep. at 18.

## Discussion

There is no medical evidence that Davis suffered a broken jaw during his arrest. Both Davis' excessive force claim and the failure to provide medical care claim rely upon the presence of a fracture caused by police action. All of the medical evidence presented to this court indicates that Davis' zygomatic arch fracture was old. Dr. Escobar's testimony is particularly revealing. He testified that the fracture was most likely at least six weeks old. Working back from the date of his surgery, the fracture occurred on or before February 25 (Facts at 24). This is consistent with Davis' admission that Dr. Escobar told him how well healed the fracture was prior to surgery and how difficult it was to repair due to the extent of healing. Facts at 25. It is also consistent with the lack of observable injury when he was seen by Dr. Inoue and by the jail nurse. Facts at 17. The lack of injury is a strong indication that the officers did not use excessive force. *Meyer v. Robinson,* 992 F.2d 734, 739 (7th Cir. 1993) ("no injury gives weight to the assertion of no excessive force.").

Davis argues that he received the fracture at the hands of the Bloomington Police Officers. Davis is not qualified to give that medical opinion. Fed. R. Evid. 701-702; *Richman v. Sheahan*, 415 F.Supp.2d 929 (N.D. Ill. 2006) (barring medical opinions proffered by police use of force experts). His opinion is particularly irrelevant where qualified doctors (including his own treating physician) have testified otherwise. Davis specifically testified that Dr. Escobar was "a highly qualified surgeon" and that the IDOC hires the best doctors available. First Davis dep. at 38. The zygomatic arch, where Davis' fracture was located, is between the eye and the ear. Facts at 26. The booking photos and photo of Davis' "fat lip" show this area clearly. Exhibits G-I of Defendant's Response to Davis' Motion for Summary Judgment (#170). Davis claimed that his "left cheekbone" was "concaved" (First Davis dep. at 51). Davis frequently described it as his "jaw" being broken. *E.g.*, First Davis dep. at 33, 56-57. However, the zygomatic arch, as Dr. Escobar described it, is located well above the cheekbone and jaw. The photographs, which Davis admits are accurate, show no indication of any injury to the zygomatic arch. It is not "concave", nor is there substantial swelling or other indicia of injury that might be expected if there were a fresh fracture. As the injury that Davis claims he suffered (a fractured zygomatic arch) was not caused by the officers during his arrest, his claims for both excessive force and failure to provide medical care fail.

Further, the officers responding to the scene were advised by MetCom that Jeff Davis was in a physical altercation – an aggravated battery – and that he was armed with a gun. Facts at 7. The officers knew Davis from prior contacts including public intoxication and resisting arrest. Facts at 1. They saw a car matching the description of his vehicle turn onto Market Street and extinguish its lights. Facts at 8. The officers conducted a felony traffic stop, in which Davis was instructed to get out of the car, raise his hands, and walk backwards toward the officers. He was then instructed to kneel down and placed face down on the ground to be handcuffed. Davis claims that he was "slammed" on the ground, but the lack of any significant injuries suggests

otherwise.

The Seventh Circuit set forth the applicable standards for excessive force cases as follows:

> Excessive force claims relating to an arrest or other seizure must be analyzed under the Fourth Amendment's objective reasonableness standard. We ask 'whether the officer's actions are 'objectively reasonable 'in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation.' Factors relevant to this inquiry include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is attempting to evade arrest by flight. We must allow for 'the fact that police officers are often forced to make split-second judgments –in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Jones v. Webb*, 45 F.3d 178, 183 (7th Cir. 1995) (citations omitted).

The Court must evaluate the officers'"use of force not with the benefit of hindsight, but rather as it appeared to the officer at the time of the encounter." *Smith v. Ball State Univ.*, 295 F.3d 763, 770-771 (7th Cir. 2002) (finding that officers who forcibly removed a potentially intoxicated driver from his car were entitled to summary judgment). Davis was wanted for aggravated battery and reportedly armed with a gun. This is a significant violent crime. Because Davis was believed to be armed and was recently involved in a violent incident, officers could assume he was a threat to their safety. The force used was commensurate with the threat posed. Davis appeared to be attempting to evade officers by extinguishing the lights on his car as he turned onto Market Street. Taking all of the facts together including the incident and the officers' prior knowledge of Davis and evaluating the totality of the circumstances, the officers used reasonable force to subdue and arrest Davis. He was taken into physical custody by Officers Hirsch and Arnold. Officer Ziemer was not involved in making the arrest, but did transport Davis to the jail. Davis does not claim that any excessive force was exerted during transport. Officer Ziemer is therefore entitled to summary judgment on the excessive force claim.

Further, the officers were not deliberately indifferent to a serious medical need. To sustain a claim based upon failure to provide medical care, Davis must show that the officers acted with deliberate indifference to his serious medical needs. *Chavez v. Cady*, 207 F.3d 901, 904 (7th Cir. 2000). The claimed "serious medical need" must be objectively sufficiently serious in that it results in the denial of the minimal civilized measure of life's necessities. *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). An objectively serious medical need is one diagnosed by a physician as mandating treatment or that is so obvious even a lay person would recognize the need for a doctor's attention. *Jackson v. Illinois Med-Car, Inc.*, 300 F.3d 760, 765 (2002). "[T]he due process clause does not require hospital care for minor injuries." *Brownell v.*

*Figel,* 950 F.2d 1285, 1291 (1991).

Davis claims that his fractured jaw was untreated. The testimony of Dr. Escobar and other evidence establish that this was an old injury at the time of Davis' arrest. It was not an injury in need of emergent care. His jaw was x-rayed while he was at McLean County Jail, and it was negative for any fracture. The photographs taken that night do not show any apparent injury. None of the police officers or correctional officers observed any significant injuries which led them to think that he required medical treatment. The jail would have refused to accept Davis if he needed emergency care. Facts at 14. Davis' jaw was x-rayed again for Dr. Escobar who found a healed fracture that must have occurred weeks before his arrest. The undisputed facts do not establish a "serious medical need" at the time the officers arrested Davis and transported him to jail.

To establish "deliberate indifference", Davis must show that the officers "acted with a sufficiently culpable state of mind" by showing that they "actually knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk."*Walker*, 293 F.3d at 1037. "Neither negligence nor even gross negligence is a sufficient basis for liability; rather, liability attaches only if the conduct is intentional or criminally reckless."*Chapman v. Keltner,* 241 F.3d 842, 845 (7th Cir. 2001). The photographs of Davis show that he did not have any obvious injuries which would lead an officer to believe that he required immediate medical care. Neither the police officers nor the correctional officers observed any significant injuries and none thought he required treatment. When he was booked in, the Field Arrest report indicated: "Medical Attention: Yes" and "Medical Comment: None stated. Minor cuts on left side of face." The inclusion of this comment makes clear that the officers were not deliberately indifferent to his medical needs. They addressed the only apparent injury that he had. The police officers' contact with Davis was limited. Officers Hirsch and Arnold did not transport Davis. None of the police officers were involved in Davis' custody or care once he was turned over to the McLean County Sheriff's custody at the jail.

It is therefore ordered:

1. The defendants, Richard Hirsch, Clayton Arnold and David Ziemer's unopposed summary judgment motion is granted [195]. The clerk of the court is directed to terminate Richard Hirsch, Clayton Arnold and David Ziemer as defendants, forthwith. At the close of this case, the clerk of the court is directed to enter judgment in favor of the defendants, Richard Hirsch, Clayton Arnold and David Ziemer's and against the plaintiff.
2. If the plaintiff wishes to appeal the court's ruling, he may file a notice of appeal with this court within 30 days of the close of this entire lawsuit. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).

Enter this 30th day of March 2007.

                                                  /s/ Harold A. Baker
                             _____
                                                 Harold A. Baker
                                         United States District Judge